HOPKINS RODEN CROCKETT
 HANSEN & HOOPES, PLLC
Sean J. Coletti, ISB No. 7199
Dillon Erickson, ISB No. 10312
Kim Reeves, ISB No. 10612
428 Park Avenue
Idaho Falls, ID 83402
Telephone: 208-523-4445
Facsimile: 208-523-4474
Email: seancoletti@hopkinsroden.com
Email: dillonerickson@hopkinsroden.com
Email: kimreeves@hopkinsroden.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| WCS CONSULTING, LLC, an Idaho Limited Liability Company,<br><br>    Plaintiff,<br><br>vs.<br><br>DANIEL SHAW, an individual; ERNST & YOUNG, LLP; ECOMMQUEST, INC.; and DOES 1-10, inclusive,<br><br> Defendants. | Case No.: 1:19-cv-00126-CWD<br><br>**SECOND AMENDED COMPLAINT** |

COMES NOW the Plaintiff, by and through its attorneys, and for a cause of action against Defendants, complains and alleges as follows:

1.     Plaintiff WCS Consulting, LLC ("WCS") is, and at all times

mentioned herein was, a limited liability company duly organized and existing under the

SECOND AMENDED COMPLAINT - 1

laws of the state of Idaho, with a principal place of business located at 390 E. Corporate Dr. #105, Meridian, Idaho 83642 and is a consulting firm.  The sole owner of WCS is Working Capital Services, LLC, an Idaho limited liability company.  The sole owner of Working Capital Services, LLC is Simon Tunmore, a citizen of the state of California.

2.       WCS is informed and believes and thereon alleges, that Defendant Ernst & Young, LLP ("EY") is, at all times mentioned herein was, a limited liability partnership duly organized and existing under the laws of Delaware, with a principal place of business located at 5 Times Square, New York, NY 10036.

3.       ECOMMQUEST, INC. ("ECOMMQUEST") is, at all times mentioned herein was, a corporation duly organized and existing under the laws of the state of Georgia, with a principal place of business located at 4151 Ashford Dunwoody Rd, Ste. 200, Atlanta, GA 30319.

4.       Daniel Shaw ("Shaw") is, at all times mentioned herein was, an individual residing in the County of Allegheny, Commonwealth of Pennsylvania.

5.       WCS does not know the true names or capacities, whether individual, corporate, associate, or otherwise, of defendants Does 1 through 10, inclusive, and, according, is suing them by these fictitious names. When the true names and capacities of such defendants have been ascertained, WCS will amend the complaint to reflect their true names and capacities. WCS is informed and believes, and thereupon alleges, that each such fictitiously named defendant is in some manner legally responsible for each of the acts, events, happenings, and occurrences described in this complaint, and proximately caused injures and damages to WCS, as alleged herein.

SECOND AMENDED COMPLAINT - 2

## JURISDICTION AND VENUE

6.      In the Confidentiality and Proprietary Rights Agreement (Exhibit A), Defendant Daniel Shaw agreed that "This Agreement, for all purposes, shall be construed in accordance with the laws of Idaho without regard to conflicts-of-law principles. Any action or proceeding by either Party to enforce this Agreement shall be brought only in any state or federal court located in the state of Idaho. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue."

7.      The Court has personal jurisdiction over all the Defendants under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and Idaho Code § 5-514. The causes of action against the Defendants arise out their acts and omissions that occurred primarily and substantially in, or were intentionally or purposefully directed towards, the State of Idaho, including Shaw's breach of a contract executed with the defendant principally located in Idaho, EY's and ECOMMQUEST's knowing and intentional tortious interference with and inducement to breach contracts executed in the State of Idaho, and EY's and ECOMMQUEST's knowing and intentional unfair competition with a business principally located in the State of Idaho.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1367.

9.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, and because Defendants are subject to the Court's personal jurisdiction with

SECOND AMENDED COMPLAINT - 3

respect to this action.

## FACTS

10.     WCS is a leading advisory, implementation, and development firm for digital supply chain solutions.  WCS is an SAP Gold partner with expertise in SAP Integrated Business Planning ("IBP").  From demand management to supplier collaboration, WCS takes the platform further with its proprietary algorithms and technologies to deliver best-in-class performance and free up millions of dollars in working capital in the process.  WCS's Agile solution delivery approach, tailored to deliver IBP solutions using the Scrum framework, allows WCS to deploy solutions and realize value for its clients with great speed.  While delivering on time and on budget is important to WCS, its focus is always on business value, and especially the value that its business clients receive from relationships with WCS employees.

11.     EY is one of the largest professional services firms in the world.  EY describes itself as a "global leader in assurance, tax, transaction and advisory services." EY also works in the digital supply chain industry, and is an SAP partner, utilizes SAP IBP.  Furthermore, like WCS, EY uses Agile methodology and infrastructure to service its clients.

12.     ECOMMQUEST is a leading recruiter for accounting firms, consulting firms, and technology firms providing three key client services: contract staffing and direct or permanent placement and managed resource programs.

13.     WCS is informed and believes, and thereupon alleges, that at all times mentioned herein, each of the defendants was the agent, servant, employee,

partner, and/or joint venturer of each of the other defendants, and, in doing the things herein mentioned, was acting within the time, place, purpose, course, and scope of such agency, service, employment, partnership, and/or joint venture, and/or with the knowledge, permission, consent, and/or ratification of each of the other defendants.

14. On or about January 18, 2017, WCS hired Shaw. Upon entering into WCS's employ, Shaw signed a Confidentiality and Proprietary Rights Agreement, attached hereto as Exhibit A.

15. Shaw was hired as a Functional Consultant. A Functional Consultant plays a key role in the successful design, build and solution deployment and adoption for WCS clients. As part of Shaw's role with WCS, Shaw was heavily involved in SAP IBP for WCS clients.

16. Key to this responsibility was Shaw's development of business relations with various clients. Shaw fostered client relationships and helped other employees do the same with other clients.

17. Through Shaw's employment, he learned many WCS trade secrets and confidential information. Shaw knew who WCS's clients were, which employees worked with which clients, how the employees got clients, how the employees made sales, which clients had which needs or problems, and how WCS employees were servicing specific clients with specific products or services.

18. Shaw knew that WCS was doing IBP work for several major clients, and that several WCS employees were assisting with this IBP work. Shaw himself was doing IBP work while with WCS. These clients were important to WCS because of the

SECOND AMENDED COMPLAINT - 5

expected revenue WCS was to receive over the life of the client contracts.  WCS expended time, money and resources to train employees to provide this IBP work for these clients.

19.     Because of the nature of the work WCS was doing, at all times pertinent, WCS took appropriate measures to ensure that the information pertaining to its work and its client contracts stayed secret and confidential.  Among other things, WCS required each person it hired to sign a Confidential and Proprietary Rights Agreement restricting the use and disclosure of confidential information.  Additionally, WCS entered into confidentiality agreements with each of its clients on its own behalf, and on behalf of each of its employees and contractors.  WCS had specific non-solicitation requirements that each employee signed pertaining to its clients.  WCS also required that employees return or destroy all confidential information upon leaving WCS for any reason.

20.     In addition, WCS specifically held information about its employees in confidence from its clients, vendors, and anyone outside of the organization, due to the sensitive nature of the work that WCS did for each client.  WCS also did not market its employees or contractors for the purposes of obtaining business, as the keeping of identities, knowledge, experience, positions, and work done for clients was extremely important to WCS and its ability to maintain its business.  Internally, WCS established an environment where its employees are the only individuals who have access to information about other employees and contractors, including the work that each employee was doing for each client.

21.     On or about August 15, 2018, Shaw resigned from his employment

at WCS.  When Shaw left, he informed WCS that he was going to go do analytics in his future employment, and would not be doing IBP work anymore.

22.     Shaw began working for EY shortly thereafter.

23.     WCS is informed and believes, and thereupon alleges that EY induced Shaw to terminate his contract with WCS in order to begin employment with EY.

24.     When Shaw terminated his employment with WCS, he took with him knowledge of WCS's trade secrets and other confidential information, as outlined above.  Specifically, Shaw took with him important knowledge and information regarding the IBP work being done by certain WCS employees for major WCS clients. This information was not generally known to the public, and was highly valuable to WCS.

25.     WCS is informed and believes, and thereupon alleges that EY and ECOMMQUEST thereafter interfered with Shaw's contractual obligations to WCS by inducing Shaw to divulge and use these trade secrets and other confidential information about WCS.  It is also believed that Shaw may have divulged other information not generally known to the public, relating directly or indirectly to: WCS business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, sales information, revenue, costs, formulae,

notes, communications, customer information, customer lists, client information, client lists, and buyer lists, and the way that one or more of these confidential components of information interplayed to allow WCS employees to service WCS clients.

26.     Shortly after leaving WCS and joining EY, Shaw, EY and ECOMMQUEST began contacting WCS employees in an attempt to recruit them to work at EY.  Specifically, Defendants focused their efforts on WCS employees that were doing IBP work for WCS.  These included, but are not limited to, Connor Donahue, Ian Keys, Alison Souhrada, Ben Colabrese, Mallory Powell, Meaghan Beathaume, Nick Steiner, Delaney McCausland, Keenan Gangewere, Dan Banning, Matt Gurbacki, Louis Ayisi, Mike Huizinga, Tom Merkle, Emily Hess and DJ Dean.  Many of these employees left WCS to join EY.  These recruiting contacts represented about 35% of WCS's workforce as of August 2018.

27.     Each of these individuals did IBP work for WCS, and worked with Daniel Shaw while Shaw was at WCS.

28.     After being contacted by Defendants, Keenan Gangewere said to Simon Tunmore, essentially, "man, these guys are good—I don't list anything about WCS or IBP anywhere online and yet they called me to be a senior consultant at EY."

29.     Shaw himself contacted Dan Banning directly and asked Banning to interview at EY because EY needed a manager for all of the employees at WCS who left to join EY.  Shaw also told Banning that Shaw would receive $5,000 for every person he gets to join EY.  Shortly after Banning's conversation with Shaw, Banning was contacted by a headhunter/recruiter for EY, which was, under information and belief, Defendant

ECOMMQUEST.

30.     Defendants' interference with the contract between Shaw and WCS has caused severe harm to WCS.  Specifically, WCS lost many of its employees who were doing IBP work for major clients, which caused WCS to lose over $950,000 in billings on a particular client.  WCS lost six such employees in one single month.  WCS also lost a client account that had been with WCS for three years because of the loss of people to EY.  These lost accounts and billings negatively affected WCS's business valuation by more than $1.2 million.

31.     WCS is informed and believes, and thereupon alleges that other individuals (DOES 1-10) may also be involved with efforts to wrongfully interfere with the contractual relations between Shaw and WCS, and the contractual relations between clients and customers of WCS and WCS, and reserves the right to add these individuals by name at a later date.

### COUNT I – Defend Trade Secrets Act (18 U.S.C.A. § 1836)

### (as to all Defendants)

32.     WCS refers to, realleges and incorporates by reference the allegations of Paragraphs 1 through 31, as though set forth fully herein.

33.     As described above, Defendants EY, ECOMMQUEST, and Shaw misappropriated trade secrets in violation of the Defend Trade Secrets Act.

34.     WCS has a significant interest in its trade secrets and confidential information, which consist of those items listed above and in paragraph 1(b) of the Confidentiality and Proprietary Rights Agreement which are not generally known to the

SECOND AMENDED COMPLAINT - 9

public.

35.     WCS took appropriate and reasonable measures to keep such information secret, as outlined in paragraphs 19 and 20 above.

36.     The information is valuable to WCS because it is in fact the substance of their business.  For years WCS has worked to find, train, evaluate, and build its employees, specifically in IBP work.  Defendants targeted employees at WCS based on their identity, clientele, skills, work history, and effectiveness in delivering IBP services to specific clients of WCS, all of which was trade secret and confidential information, not generally known to the public.  But Daniel Shaw knew this information, and used it to EY's advantage for its own IBP needs.  Defendants' use of this confidential information, and the subsequent results thereof, put WCS in a position whereby it was unable to perform the services it had been contracted for, or to enter into any additional contracts.

37.     EY and ECOMMQUEST obtained WCS's trade secrets by improper means.  Daniel Shaw had an obligation to keep trade secrets and confidential information of WCS confidential pursuant to written agreements, yet he divulged or used that information in violation of the Agreement.  EY and/or ECOMMQUEST encouraged Shaw to do so, and EY offered Shaw monetary compensation for such disclosures and use.

38.     As a result of Shaw's disclosure and use of trade secrets and confidential information and EY and ECOMMQUEST's acquisition of trade secrets and confidential information, WCS has suffered tremendous financial loss as described in this

Complaint.

39.     Shaw, EY, and ECOMMQUEST acted willfully and maliciously when they disclosed and/or obtained trade secrets by improper means. WCS is therefore entitled to exemplary damages.

## Count II – Breach of Contract

### (as to Defendant Daniel Shaw)

40.     WCS refers to, realleges and incorporates by reference the allegations of Paragraphs 1 through 39, as though set forth fully herein.

41.     On or about January 18, 2017, Shaw entered into a Confidentiality and Proprietary Rights Agreement which restricted the disclosure of Confidential Information, as stated above.

42.     On or about August 15, 2018, Shaw resigned from his employment at WCS.

43.     Shaw began working for EY shortly thereafter.

44.     WCS is informed and believes, and thereupon alleges that, in violation of the Confidentiality and Proprietary Rights Agreement requirement at ¶1(b)(i) "to treat all Confidential Information as strictly confidential," Shaw unlawfully disclosed confidential information listed in the Agreement to outside entities like ECOMMQUEST and EY.

45.     WCS is informed and believes, and thereupon alleges that, in violation of the Confidentiality and Proprietary Rights Agreement requirement at ¶ 1(b)(ii) to "not directly communicate or make available Confidential Information, or

allow it to be disclosed . . . or made available, in whole or part . . . to anyone outside of the direct employ of the Employer except as required in the performance of the Employee's authorized employment duties to the Employer and only after execution of a confidentiality agreement by the third party," Shaw unlawfully disclosed confidential information in the form of highly valuable WCS business information as described above, including but not limited to WCS's IBP operations for its clients, and which WCS employee worked with those clients, to ECOMMQUEST and/or EY.

46.     WCS is informed and believes, and thereupon alleges that ECOMMQUEST and/or EY unlawfully utilized that confidential information in order to contact WCS employees with the intent to bring them and their clients from WCS to convert them into EY employees and clients, respectively.

47.     WCS is informed and believes, and thereupon alleges that, in violation of the Confidentiality and Proprietary Rights Agreement requirement at ¶ 1(b)(iii) "not to access or use any Confidential Information . . . except as required in the performance of the Employee's authorized employment duties to the Employer or with the prior written consent of an authorized officer acting on behalf of the Employer," Shaw used confidential information of WCS not in the performance of any employment duties to WCS, but to benefit himself and a third-party competitor, EY.

48.     WCS is informed and believes, and thereupon alleges that in exchange for Shaw's disclosure of confidential information, he was compensated five thousand dollars ($5,000.00) for each employee that was recruited using unlawfully disclosed information that began working at EY.

SECOND AMENDED COMPLAINT - 12

49.    Shaw has been and remains in breach of the Confidentiality and Proprietary Rights Agreement, having disclosed confidential information to both ECOMMQUEST and EY.

50.    Defendant Shaw has caused WCS to incur damages in an amount not less than $950,000, as described in paragraphs 30 and 31, above, as a direct result of the breach of the Agreement.

<u>**COUNT III – Tortious Interference With Contractual Relations**</u>

**(as to Defendants EY and ECOMMQUEST)**

51.    WCS refers to, realleges and incorporates by reference the allegations of Paragraphs 1 through 50, as though set forth fully herein.

52.    In January 2017, WCS and Shaw entered into the Agreement.

53.    Sometime thereafter, EY and/or ECOMMQUEST learned of Shaw's contract with WCS and the particulars thereof, including the provision prohibiting wrongful disclosure or use of confidential information.

54.    EY and/or ECOMMQUEST induced Shaw to breach the Agreement requirement at ¶1(b)(i) "to treat all Confidential Information as strictly confidential," by unlawfully disclosing confidential information listed in the Agreement to outside entities like ECOMMQUEST and EY.

55.    EY and/or ECOMMQUEST induced Shaw to breach the Agreement requirement at ¶1(b)(ii) to "not directly communicate or make available Confidential Information, or allow it to be disclosed . . . or made available, in whole or part . . . to anyone outside of the direct employ of the Employer except as required in the

performance of the Employee's authorized employment duties to the Employer and only after execution of a confidentiality agreement by the third party," by Shaw unlawfully disclosing confidential information in the form of highly valuable WCS business information as described above, including but not limited to WCS's IBP operations for its clients, and which WCS employee worked with those clients, to ECOMMQUEST and/or EY.

56.    EY and/or ECOMMQUEST induced Shaw to breach the Agreement requirement at ¶1(b)(iii) "not to access or use any Confidential Information . . . except as required in the performance of the Employee's authorized employment duties to the Employer or with the prior written consent of an authorized officer acting on behalf of the Employer," by Shaw using confidential information of WCS not in the performance of any employment duties to WCS, but to benefit himself and a third-party competitor, EY.

57.    EY and/or ECOMMQUEST induced Shaw into one or more of the above actions by not only offering alternative employment to Shaw but by also offering monetary compensation for each additional WCS employee he could recruit to EY and ECOMMQUEST.

58.    After Shaw terminated his employment with WCS, he in fact breached the Agreement by (i) failing to treat as confidential information stated in the Agreement, (ii) unlawfully disclosing information to EY and/or ECOMMQUEST, and (iii) using information to benefit himself and the other Defendants, all in exchange for monetary compensation.

SECOND AMENDED COMPLAINT - 14

59.     The actions taken by EY and/or ECOMMQUEST were done intentionally to interfere with the Agreement between WCS and Shaw.

60.     WCS has suffered significant loss of business and revenue as a result of the Defendants' interference in the obligations of the Agreement, as has been stated above.

## COUNT IV – Common Law Unfair Competition

## Restatement (Third) of Unfair Competition, § 1

### (as to Defendants EY and ECOMMQUEST)

61.      WCS refers to, realleges and incorporates by reference the allegations of Paragraphs 1 through 60, as though set forth fully herein.

62.     WCS is informed and believes, and thereupon alleges that EY and ECOMMQUEST engaged in the tortious interference with WCS contracts, which amounts to unfair competition.

63.     WCS is informed and believes, and thereupon alleges that EY and/or ECOMMQUEST engaged in unfair, unethical, and unconscionable competition practices by interfering with Shaw's contract with WCS to the degree that Shaw breached his Confidentiality and Proprietary Rights Agreement, in one or more of the ways as outlined above.

64.     WCS is informed and believes and thereupon alleges that EY and/or ECOMMQUEST engaged in a systematic pattern of activities to improperly induce specific employees of WCS to leave employment with WCS based on their skills and connections to certain clients—those relationships, skills and knowledge as known only

SECOND AMENDED COMPLAINT - 15

to Daniel Shaw—and to begin working at EY, a purpose of which was to destroy an integral part of WCS's business.

65.     WCS is informed and believes, and thereupon alleges that EY and/or ECOMMQUEST unlawfully used information that was confidential to WCS to their own advantage.

66.     WCS is informed and believes, and thereupon alleges that EY and/or ECOMMQUEST carried out these actions with the intent to cause harm to WCS.

67.     WCS has suffered significant loss of business and revenue as a result of the defendants' unfair competition practices, as described above.

## ATTORNEY'S FEES

68.     WCS refers to, realleges and incorporates by reference the allegations of Paragraphs 1 through 67, as though set forth fully herein.

69.     That it has become necessary for Plaintiff to employ counsel to pursue its claims herein, and it has engaged the firm of Hopkins Roden Crockett Hansen & Hoopes, PLLC for that purpose and agreed to pay the firm a reasonable fee, for which Plaintiff is entitled to be reimbursed by the Defendants in accordance with 18 USC § 1836(b)(3)(D), Idaho Code §§ 12-120(3) and 12-121 or other applicable provisions of the Idaho Code or United States Code.

WHEREFORE, Plaintiff prays the judgment, order and decree of this Court, as follows:

SECOND AMENDED COMPLAINT - 16

1.     That judgment be entered for Plaintiff and against Defendants as prayed for herein;

2.     That Plaintiff be awarded its monetary and compensatory damages of at least $950,000, plus interest, as may be proven at trial;

3.     That Plaintiff be awarded such further punitive and exemplary damages in an amount to be determined at trial;

4.     That Plaintiff be awarded an injunction (a) against Shaw preventing Shaw, and any others acting at his direction, from further disclosing any of WCS's trade secret or confidential information to ECOMMQUEST and EY; (b) preventing EY from utilizing any of WCS's trade secret or confidential information that was disclosed to it by Shaw or ECOMMQUEST; and (c) requiring ECOMMQUEST and EY to destroy, with proof to the satisfaction of the Court, all of WCS's trade secret or confidential information that has been used or disclosed by ECOMMQUEST or EY;

5.     That Plaintiff be awarded its reasonable attorney's fees and costs incurred herein;

6.     That Plaintiff be awarded its pre- and post-judgment interest; and

7.     That Plaintiff be awarded such other and further relief as to the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury of not less than 12 persons as to all triable issues to a jury in this matter.

SECOND AMENDED COMPLAINT - 17

DATED this 19th day of November, 2019.

Respectfully submitted,

HOPKINS RODEN CROCKETT
HANSEN & HOOPES, PLLC

By: ___/s/ Sean J. Coletti_____
  Sean J. Coletti
  Attorneys for Plaintiff



# Confidentiality and Proprietary Rights Agreement

This Employee Confidentiality and Proprietary Rights Agreement ("Agreement") is entered into by and between WCS Consulting, LLC, a subsidiary of Working Capital Services, LLC, with principal offices at 1020 N. Hickory Ave, Suite 100, Meridian, ID 83642, (the "Employer") and _Daniel Shaw_ (the "Employee") (the Employer and the Employee are collectively referred to herein as the "Parties") as of _1/18/2017_ (the "Effective Date").

In consideration of the Employee's employment by the Employer, which the Employee acknowledges to be good and valuable consideration for his/her obligations hereunder, the Employer and the Employee hereby agree as follows:

1.  <u>Confidentiality and Security.</u>

    (a)     Confidential Information

    The Employee understands and acknowledges that during the course of employment by the Employer, he/she will have access to and learn about confidential, secret and proprietary documents, materials and other information, in tangible and intangible form, of and relating to the Employer and its businesses and existing and prospective customers, suppliers, investors and other associated third parties ("**Confidential Information**"). The Employee further understands and acknowledges that this Confidential Information and the Employer's ability to reserve it for the exclusive knowledge and use of the Employer is of great competitive importance and commercial value to the Employer, and that improper use or disclosure of the Confidential Information by the Employee might cause the Employer to incur financial costs, loss of business advantage, liability under confidentiality agreements with third parties, civil damages and criminal penalties.

    For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls,

*revised January 2017*

EXHIBIT

"A"

security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, manufacturing information, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, and buyer lists of the Employer or its businesses or any existing or prospective customer, investor or other associated third party, or of any other person or entity that has entrusted information to the Employer in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Employee understands and agrees that Confidential Information developed by him/her in the course of his/her employment by the Employer shall be subject to the terms and conditions of this Agreement as if the Employer furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Employee, provided that such disclosure is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

(b)     Disclosure and Use Restrictions

The Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow it to be disclosed, published, communicated or made available, in whole or part, to any entity or person whatsoever (including other employees of the Employer/third party not having a need to know and authority to know and use the Confidential Information in connection with the business of the Employer and, in any event, not to anyone outside of the direct employ of the Employer except as required in the performance of the Employee's authorized employment duties to the Employer and only after execution of a confidentiality agreement by the third party with whom Confidential Information will be shared or with the prior consent of an authorized officer acting on behalf of the Employer in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of the Employer, except as required in the performance of the Employee's authorized employment duties to the Employer or with the prior consent of an authorized officer acting on behalf of the Employer in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent). Nothing herein shall be construed to prevent disclosure of

Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation or order. The Employee shall promptly provide written notice of any such order to an authorized officer of the Employer. In addition, this Section does not, in any way, restrict or impede the Employee from disclosing information as permitted by law.

(c)     Duration of Confidentiality Obligations

The Employee understands and acknowledges that his/her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information (whether before or after he/she begins employment by the Employer) and shall continue during and after his/her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

2.     Proprietary Rights.

(a)     Work Product

The Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived or reduced to practice by the Employee individually or jointly with others during the period of his/her employment by the Employer and relating in any way to the business or contemplated business, research or development of the Employer (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical and electronic copies, all improvements, rights and claims related to the foregoing, and other tangible embodiments thereof (collectively, **"Work Product"**), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), patents and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions and renewals thereof (collectively, **"Intellectual Property Rights"**), shall be the sole and exclusive property of the Employer.

For purposes of this Agreement, Work Product includes, but is not limited to, Employer information, including plans, publications, research, strategies, techniques, agreements, documents, contracts, terms of agreements, negotiations, know-how, computer programs, computer applications, software design, web design, work in process, databases, manuals, results, developments, reports, graphics, drawings, market

studies, formulae, notes, communications, algorithms, product plans, product designs, styles, models, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, client information, customer lists, client lists, manufacturing information, marketing information, advertising information, and sales information.

    (b)    Work Made for Hire; Assignment

        The Employee acknowledges that, by reason of being employed by the Employer at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and such copyrights are therefore owned by the Employer. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns to the Employer, for no additional consideration, the Employee's entire right, title and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim and recover for all past, present and future infringement, misappropriation or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Employer's rights, title or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Employer would have had in the absence of this Agreement.

    (c)    Further Assurances; Power of Attorney

        During and after his/her employment, the Employee agrees to reasonably cooperate with the Employer at the Employer's expense to (i) apply for, obtain, perfect and transfer to the Employer the Work Product as well as an Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (ii) maintain, protect and enforce the same, including, without limitation, executing and delivering to the Employer any and all applications, oaths, declarations, affidavits, waivers, assignments and other documents and instruments as shall be requested by the Employer. The Employee hereby irrevocably grants the Employer power of attorney to execute and deliver any such documents on the Employee's behalf in his/her name and to do all other lawfully permitted acts to transfer the Work Product to the Employer and further the transfer, issuance, prosecution and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Employee does not promptly cooperate with the Employer's request (without limiting the rights the Employer shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be effected by the Employee's subsequent incapacity.

    (d)    Moral Rights

        To the extent any copyrights are assigned under this Agreement, the Employee hereby irrevocably waives, to the extent permitted by applicable law, any and

*revised January 2017*                                                **Page 4 of 8**

all claims the Employee may now or hereafter have in any jurisdiction to all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as "moral rights" with respect to all Work Product and all Intellectual Property Rights therein.

      (e)    No License

      The Employee understands that this Agreement does not, and shall not be construed to, grant the Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software or other tools made available to him/her by the Employer.

3.    Security.

      (a)    Security and Access

      The Employee agrees and covenants (i) to comply with all Employer security policies and procedures as in force from time to time ("**Facilities Information Technology and Access Resources**"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by Employer; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Employee's employment by the Employer, whether termination is voluntary or involuntary. The Employee agrees to notify the Employer promptly in the event he/she learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction or reverse engineering of, or tampering with any Facilities and Information Technology Access Resources or other Employer property or materials by others.

      (b)    Exit Obligations

      Upon (i) voluntary or involuntary termination of the Employee's employment or (ii) the Employer's request at any time during the Employee's employment, the Employee shall (a) provide or return to the Employer any and all Employer property and all Employer documents and materials belonging to the Employer and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Employer or any of its business associates or created by the Employee in connection with his/her employment by the Employer; and (b) delete or destroy all copies of any such documents and materials not returned to the Employer that remain in the Employee's possession or control, including those stored on any non-Employer devices, networks, storage locations and media in the Employee's possession or control.

4.    Non-Disparagement. The Employee agrees and covenants that he/she will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning the

Employer's products or services, and existing and prospective customers, suppliers, investors and other associated third parties, or make any maliciously false statements about the Employer's employees and officers.

5.    Acknowledgement. The Employee acknowledges and agrees that the services to be rendered by him/her to the Employer are of a special and unique character; that the Employee will obtain knowledge and skill relevant to the Employer's industry, methods of doing business and marketing strategies by virtue of the Employee's employment; and that the terms and conditions of this Agreement are reasonable under these circumstances. The Employee further acknowledges that the amount of his/her compensation reflects, in part, his/her obligations and the Employer's rights under this Agreement; that he/she has no expectation of any additional compensation, royalties or other payment of any kind not otherwise referenced herein in connection herewith; that he/she will not be subject to undue hardship by reason of his/her full compliance with the terms and conditions of this Agreement or the Employer's enforcement thereof; and that this Agreement is not a contract of employment and shall not be construed as a commitment by either of the Parties to continue an employment relationship for any certain period of time. Nothing in this Agreement shall be construed to in any way terminate, supersede, undermine or otherwise modify the "at-will" status of the employment relationship between the Employer and the Employee, pursuant to which either the Employer or the Employee may terminate the employment relationship at any time, with or without cause, with or without notice.

6.    Remedies. In the event of a breach or threatened breach by the Employee of any of the provisions of this Agreement, the Employee hereby consents and agrees that the Employer shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that monetary damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief.

7.    Successors and Assigns.

    (a)    Assignment by the Employer

        The Employer may assign this Agreement to any subsidiary or corporate affiliate, or to any successor or assign (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Employer. This Agreement shall inure to the benefit of the Employer and permitted successors and assigns.

    (b)    No Assignment by the Employee

*revised January 2017*                                    **Page 6 of 8**

The Employee may not assign this Agreement or any part hereof. Any purported assignment by the Employee shall be null and void from the initial date of purported assignment.

8.    Arbitration. Any dispute, controversy or claim arising out of or related to this Agreement or any breach of this agreement shall be submitted to and decided by binding arbitration. Arbitration shall be administered exclusively by JAMS and shall be conducted consistent with the rules, regulations and requirements thereof. Any arbitral award determination shall be final and binding upon the Parties. In the event that this Agreement becomes subject to arbitration, the Parties agree that the prevailing Party shall be entitled to an award of attorney's fees, costs, and the prevailing statutory interest from the other Party.

9.    Governing Law; Jurisdiction and Venue. This Agreement, for all purposes, shall be construed in accordance with the laws of Idaho without regard to conflicts-of-law principles. Any action or proceeding by either Party to enforce this Agreement shall be brought only in any state or federal court located in the state of Idaho. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defence of inconvenient forum to the maintenance of any such action or proceeding in such venue.

10.    Entire Agreement. Unless specifically provided herein, this Agreement contains all the understandings and representations between the Employee and the Employer pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

11.    Modification and Waiver. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Employee and by a DULY AUTHORIZED OFFICER of the Employer (other than the Employee). No waiver by either of the Parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the Parties in exercising any right, power or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power or privilege.

12.    Severability. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the Parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The Parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this

Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement or by making such other modifications as it deems warranted to carry out the intent and agreement of the Parties as embodied herein to the maximum extent permitted by law. The Parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had not been set forth herein.

13.   Captions. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

14.   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date above.

| | |
|---|---|
| WCS Consulting, LLC | |
| By _John Bisaro_ | By _(signature)_ |
| Name: John Bisaro <br> Title: Partner | Print Name: Daniel Shaw |

*revised January 2017*

Page 8 of 8